UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TANIKA THOMAS                                                    PLAINTIFF

v.                                        CIVIL ACTION NO. 3:12-CV-568-DW

MICHAEL J. ASTRUE,
Commissioner of Social Security                                 DEFENDANT

### MEMORANDUM OPINION

Plaintiff Tanika Thomas has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain judicial review of a final decision of the Commissioner of Social Security that denied her application for supplemental security income (SSI).[1]  Thomas applied for SSI on August 5, 2009, alleging that she was disabled as of July 15, 2008, due to constant pain on the left side of her body (Tr. 52).  The Commissioner denied Thomas's claims on initial consideration (Tr. 132-135) and on reconsideration (Tr. 140-142).  Thomas requested a hearing before an Administrative Law Judge (ALJ) (Tr. 143-145).

ALJ Emery D. Curlee conducted a hearing in Louisville, Kentucky, on June 14, 2011 (Tr. 26-54).  Thomas attended with her attorney, Lisa Belew (Tr. 26).  Thomas and vocational expert (VE) Sharon Lane testified at the hearing (Tr. 29-51, 1-54).  Following the conclusion of the hearing, ALJ Curlee entered a hearing decision on June 24, 2011, that found Thomas is not disabled for the purposes of the Social Security Act (Tr. 15-21).

In his adverse decision, ALJ Curlee made the following findings:

1.    The claimant has not engaged in substantial gainful activity since Aug. 5, 2009, the application date (20 C.F.R. 416.971, *et seq.*).

---

[1] Thomas and the United States have consented (DN 14) to proceed before the Magistrate Judge pursuant to 28 U.S.C. § 626 ( c ) as if before the district court so as to permit the entry of an appealable final judgment by the Magistrate Judge.

2.      The claimant has the following medically determinable impairments:  diffuse
        myalgias with uncertain etiology and optic neuritis (20 C.F.R. 416.921, *et seq.*).

3.      The claimant does not have an impairment or combination of impairments that
        has significantly limited (or is expected to significantly limit) the ability to
        perform basic work-related activities for 12 consecutive months; therefore, the
        claimant does not have a severe impairment or combination of impairments (20
        C.F.R. 416.921, *et seq.*).

4.      The claimant has not been under a disability, as defined in the Social Security
        Act, since Aug. 5, 2009, the date the application was filed (20 C.F.R. 416.920(c).

Thomas sought review of the hearing decision by the Appeals Council (Tr. 10-11).  The Appeals

Council denied her request for review, finding no reason under the Rules to review ALJ Curlee's

decision (Tr. 1-4).  The present lawsuit followed.


**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death, or which has lasted or can be expected to last for a continuous period of not

less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant

for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.

20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the

claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the

claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See,*

*Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step

2 of the evaluation process whether the claimant has a severe impairment or combination of

2

severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations.  20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix.  *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3)  The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who can not return to his or her

3

past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).  Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard.  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.).  Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*).  It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the

record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).


**Issue for Review.**

The sole question raised by the Plaintiff, who is proceeding on her own behalf, is whether the decision of the Commissioner is supported by substantial evidence. The ALJ found Thomas to be not disabled at step 2 of the sequential evaluation process. In other words, ALJ Curlee found in finding of fact no. 3 (Tr. 17-21) that Thomas's impairments of diffuse myalgia of uncertain etiology and optic neuritis do not significantly limit her ability to perform basic work activities (Tr. 17). Because none of her medically determinable impairments were considered to be severe - - all were so slight that they could not result in a finding of disability irrespective of her age, education and work history - - the Commissioner denied her claim at step 2. See 20 C.F.R. §416.920(a)(4)(ii) (2012).[2]

_____

[2] The cited regulation provides that:

(2) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement

Thomas in her *pro se* fact and law summary does not cite to any specific finding of ALJ Curlee that she disputes. Rather, she argues simply that she cannot perform any work because she is in constant pain on her left side (Tr. 16, p. 4). This pain, according to her, makes her left side so sensitive that she cannot have anyone, or even clothing, touch it (Id.). Her pain, she explains, prevents her from doing little more than her housework and caring for her four school-age children. Thomas also maintains that ALJ Curlee slept through a significant portion of her hearing, and that certain evidence is "missing" from the administrative record. Thomas has attached to her fact and law summary a thermographic report obtained by thermographer Sondra Warren on Jan. 9, 2013, more than one year *after* the hearing decision of June 24, 2011 (Tr. 12-21). Apparently the thermographic report is the evidence missing from the record.

**Finding of Fact No. 3**

A careful examination of the testimony of the claimant, her background, her work and medical history, persuades the Magistrate Judge that the decision of ALJ Curlee is supported by substantial evidence. In particular, substantial evidence supports the ALJ's finding that Thomas's impairments are not severe. An impairment will be deemed to be non-severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. §416.921(a)(2012). Basic work activities under the same regulation involve the ability and aptitude necessary to do most jobs. 20 C.F.R. §416.921(b). Included in basic work

_____

in §416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

*Id.*

6

activities are physical functions such as walking, sitting, lifting, pushing, pulling, reaching, carrying or handling. 20 C.F.R. §416.921(b)(1)(2012). Also included in such activities are capacities for seeing, hearing and speaking; understanding and carrying out instructions; using judgment, responding appropriately to supervision and co-workers; and, dealing with changes in a routine work setting. 20 C.F.R.§416.921(b)(2)-(6) (2012).

Step 2 of the sequential evaluation process has repeatedly been held to be "a *de minimus* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862-863 (6th Cir. 1988) (collecting cases). An impairment will be considered to be *de minimus*, or nonsevere, only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* (citing *Farris v. Sec'y of HHS*, 773 F.2d 85, 90 (6th Cir. 1985)). While the "vast majority of cases" may not be dismissed without consideration of a claimant's vocational factors, "Congress [nevertheless] has approved the threshold dismissal of claims obviously lacking medical merit, because in such cases the medical evidence demonstrates no reason to consider age, education and experience." *Id.* at 862-863 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)). Accordingly, dismissal at step 2 will be, and remains, entirely appropriate as a means to "screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863 (citing *Ferris*, 773 F.2d at 90 n.1). *See also, Maloney v. Apfel*, 211 F.3d 1269 (table), Case No. 99-3081, 2000 WL 420700 at *2 (6th Cir. 2000) (*per curiam*) (substantial evidence supported denial of benefits where record indicated claimant presented with symptoms and was diagnosed with disorder, but did not show any resulting impairment that would prevent work); *Foster v. Sec'y of HHS*, 899 F.2d 1221 (table), Case No. 88-1644, 1990 WL 41835 at *2 (6th Cir. 1990) (*per curiam*) (substantial evidence supported

denial of benefits where claimant produced no evidence on the frequency, intensity and duration of his arthritic pain, and medical records indicated he was no more than slightly or minimally impaired).

Thomas bears the burden at step 2 of the sequential evaluation process to establish that the administrative record contains objective medical evidence that shows her inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See Despins v. Comm'r of Sec. Sec.*, 257 Fed. Appx. 923, 929 (6th Cir. 2007).  The mere existence of a physical or mental impairment does not, of itself, establish that a claimant is significantly limited from performing basic work activities for a continuous period of time. *Id*. (citing *Higgs*, 880 F.2d at 863; *Foster*, 853 F.2d at 489).  Indeed, as *Despins* explains, "We have previously noted, albeit in an unpublished decision, that '[w]hen doctors' reports contain no information regarding physical limitations or the intensity, frequency and duration of pain associated with the condition, this court has regularly found substantial evidence to support a finding of no severe impairment.'" *Id*. (citing *Long v. Apfel*, 1 Fed. Appx. 326, 331 (6th Cir. 2001). *See also, Maloney v. Apfel*, Case No. 99-3081, 2000 WL 420700 (6th Cir. Apr. 14, 2000).

Here, a thorough review of the medical records submitted by the claimant reveals no medically determinative impairments that would significantly limit Thomas's ability to perform basic work activities as defined by 20 C.F.R. §416.921(b)(1)-(6) (2012).  No conclusive diagnosis for Thomas's ongoing, subjective complaints of left-side pain was ever established by any treating physician who examined her.  Repeated diagnostic imaging studies, laboratory tests

and ultrasound examination all proved to be within normal limits, and showed at most some arthritic degeneration, osteitis pubis, in the pubic bone.

Further, while Thomas occasionally was prescribed various pain medications, such as Ibuprofen, Flexeril and Elavil, she admitted during the hearing (and the medical records confirm) that Thomas voluntarily ceased taking her pain medications for extended periods of time. No treating physician, as best the Court can determine, ever imposed any physical restrictions upon her. Her physical examinations routinely showed no motor or strength deficits in any of her extremities; nor was she limited in any fashion in her ability to ambulate, sit or stand. In several instances, Thomas was discharged from care due to her failure to follow up with office appointments or appear for physical therapy treatment. As the medical records discussed below confirm, Thomas simply failed to show that she was physically limited in any fashion by her left side pain of unknown etiology.

At the time of the hearing, Tanika Thomas was 33 years old, 5'11" tall, and weighed approximately 225 lbs (Tr. 29-30). She graduated from high school and was trained as a beautician (Tr. 30). Thomas lived in a home with her four children, ages 13, 8, 7 and 6, whom she cared for herself (*Id*.). In her words, her "biggest problem, which seems to be the only problem," is that the left side of her body stays in constant pain. (*Id*.). Thomas testified that she cannot stand to have anything touch her left side, not even her own stomach when she sits (Tr. 31). According to her, she has "major pain" that runs all the way from the left side of her face down to her left ankle. (*Id.*). This pain is described as a squeezing, burning, tingling sensation that precludes her from comfortably wearing clothes (Tr. 31-32). She cannot stand to have anyone touch her left side, or even to wear clothing for extended periods. (Tr. 32). She cannot

9

lie down on her left side (Tr. 33).

Despite her unrelenting pain, which Thomas characterized as being an 8 on a 10-point scale, Thomas is able to care for her four school-age children, albeit with help from the eldest (Tr. 34).  She takes them to the bus stop in the morning and will fix them dinner when they return in the afternoon. (Tr 34-35).  Thomas acknowledges that some days she is able to do the household chores, but she has also taught her 13-year-old son how to help with the laundry, cleaning the house and caring for his siblings (Tr. 35).  Thomas also acknowledged that sometimes she is able to shop at the grocery store, although she has problems with twisting to pick up groceries and put them in the basket (Tr. 36).

Thomas admitted at the time of the hearing that she was not taking any pain medication (Tr. 36).  According to her, the medications caused the left side of her face to droop and her hair to fall out (Tr. 36).  She conceded that she is supposed to be on pain medication, "but nothing helps" and the medication makes her sleepy (Tr. 37).  Her rib cage area and stomach pain level, according to  Thomas, stay at level 10 pain at all times (Tr. 37).

Thomas testified that sometimes her stomach will swell without reason (Tr. 38). She attributed the swelling to "several tumors that are in there" and cysts on her ovaries (Tr. 38).[3]  Thomas recalled that her left-side pain began suddenly while she was working at a daycare rocking an infant (Tr. 39).  After the initial "burst of pain on [her] left side," Thomas explained that she began having different pain-related problems every day thereafter (*Id*.).  Thomas recalled that by the year 2007, her pain was to the point where she could no longer bear to wear

---

[3]  Deep tissue biopsy on Thomas's left side showed only lipoma, a nodular fat deposit with no cancerous lesions.

clothes, and her children could not sit in her lap (Tr. 40). She was having a hard time driving, although she remains able to drive for short distances (Tr. 40-41). Thomas claimed that certain unnamed doctors advised her to get "a spinal tap, a brain spinal tap" to reduce her pain, but the medical records contain no such recommended treatment (Tr. 44).

Review of the medical records reveals that Thomas obtained treatment from the Park DuValle Community Health Center from Sept. 17, 2007, through June 10, 2008 (Tr. 266-271). In September of 2007, she appeared with complaints of pain on her left side and face for the past three days, along with lower stomach pain (Tr. 271). She was given a prescription of Motrin 400 (*Id.*). Thomas did not return to the health center until seven months later on April 21, 2008, again with complaints of pain in her left side and back radiating to her lower left foot (Tr. 269). Once again, she was prescribed Motrin, 400 mg. and Robaxin (*Id.*). The following month, on May 12, 2008, she again returned requesting "pain meds." Examination revealed no limitation in her range of motion in the back (Tr. 268). She was prescribed Naproxen, 500 mg., and Vistaril, 50 mg. (*Id.*). The final treatment note, dated June 10, 2008, indicates that Thomas related only tingling and numbness in her arms (Tr. 226). The record contains no further treatment notes from the Park Duvalle Community Health Center.

On several occasions, Thomas appeared at the University of Louisville Hospital Emergency Room with complaints of pain (Tr. 272-302). She first appeared on April 2, 2007, with complaints of generalized pain in her back and legs (Tr. 299). On that occasion, she reported that she had taken no prescription medication for two years (Tr. 299, 301). She related only a history of blood clots (Tr. 301). Thomas was treated and released the same day with no limitation (Tr. 299-302).

She returned to the U of L emergency room on Sept. 16, 2007, with complaints of pain in the right ear (Tr. 290-293). She once again was discharged that same day (*Id.*). Thomas returned on a third occasion to the U of L hospital on May 29, 2008, with complaints of sciatic and back pain (Tr. 287). She received an MRI examination of her lumbar spine (Tr. 288-89). Diagnostic imaging revealed only minimal disk disease at the L4-L5 and L5-S1 with no significant impingement of the nerve roots (Tr. 288-89). Subsequently, on Aug. 26, 2008, Thomas underwent a CT scan of her chest to address her complaints of left arm numbness (Tr. 283). Multiple transaxial images of the chest revealed no acute pulmonary emboli, no pleural or pericardial effusions, no pulmonary parenchymal abnormalities, and no pneumothorax (Tr. 283). Her heart and great vessels appeared to be unremarkable. Radiological examination of the chest showed normal bones with her heart being within normal limits and lungs well aerated and clear (Tr. 282). Dr. James Reed's impression was no active cardiopulmonary disease (*Id.*).

On Sept. 2, 2008, Thomas began treatment at Pain Management of Kentucky (Tr. 307-310) Physical examination revealed a decreased range of motion in the lumbar and cervical spine with tenderness (Tr. 308). Dr. Arul Verghis noted numerous trigger points in the elbow, knee and gluteal regions, but normal straight leg raising tests and normal deep tendon reflexes with normal strength in both upper and lower extremities (Tr. 308). Dr.Verghis's impression was cervical radiculopathy, lumbar radicular pain syndrome, situational depression and moderate obesity (Tr. 308). His diagnostic impression was left upper extremity radiculopathy with possible referable pain including thoracic spine, in addition to fibromyalgia (Tr. 309). Due to his diagnosis of depression, Dr. Verghis prescribed a low does of Elavil and recommended an MRI of the cervical spine "to look for specific sources for her symptoms." (Id.). Treatment notes

12

indicate that Thomas had a "negative arthritis workup." (Id.).

On Sept. 23, 2008, Thomas returned for further treatment at Pain Management of Kentucky (Tr. 307-310). On that occasion, her current medications were listed as Flexeril, Ibuprofen and Elavil (Tr. 306). Her diagnosis at the time was left upper extremity radiculopathy and lower back pain radiating to the left leg (Id.). Thomas presented with a history of chronic neck pain and pain in the left upper and lower extremities, which she then attributed to a motor vehicle accident that occurred in 2004 (Tr. 307). On that occasion, Thomas described her pain as being located primarily in her neck and radiating into the left upper extremity and her back (Id.).

An MRI of Thomas's cervical spine, however, revealed a normal alignment of the cervical disks, with no disk bulges or herniations (Tr. 310). An MRI of the lumbar spine also was noted to be negative for any significant pathology to explain her lower left leg pain (Tr. 307). Nonetheless, Thomas described her pain as being a continuous dull ache, which she rated to be 8 out of 10 on a 10-point scale (Tr. 307). She reported that her pain increased with physical activity such as bending, walking, reaching and neck movement (Id.). Thomas related that anti-inflammatory medication, Tylenol and Felxeril provided only minimal relief to her (Id.). No futher treatment records are contained in the administrative record. Thomas apparently did not continue treatment with Pain Management Kentucky or Dr. Verghis.

On Oct. 31, 2008, Thomas underwent diagnostic imaging of her hips and pelvis. X–rays of the left hip revealed normal joint space, no significant spurring, no fracture and only

13

degenerative changes of the pubic symphysis.[4]   The diagnostic impression of Dr. Sharon

Maxfield was osteitis pubis[5] (Tr. 311).   A transabdominal and transvaginal pelvic ultrasound

revealed a normal uterus with no lesions or free fluid, along with normal ovaries except for a

"small cyst" on the lower left ovary (Tr. 313).   Dr. Lori Haycraft's impression was a normal

pelvic ultrasound (*Id*.).

Thomas also received medical treatment from Marlyce Hill Ali at the Westside

Medical Center beginning in mid-June of 2008, for complaints of pain (Tr. 329-342).   Dr. Ali

prescribed anti-inflammatory medication, non-narcotic pain medication, along with referral to

the previously mentioned pain clinic (Tr.342).   According to Dr. Ali, Thomas "was not

compliant with her medication regimen as well as in keeping her followup appointments."   (*Id*).

After obtaining ultrasound and x-rays, Thomas was scheduled for followup with Dr. Ali on Nov.

3, 2008.   She failed to appear on that date, only to appear at Dr. Ali's office on Nov. 20, 2008,

complaining of pain (*Id*.).   Dr. Ali's partner referred Thomas to gynecologist, and Thomas

ceased treatment with Dr. Ali the following day on Nov. 21, 2008.

After Thomas allegedly made certain angry statements to Dr. Ali in December of

2008, when he declined to refer her to a bone specialist, he requested that she be removed as a

patient from his practice effective immediately (Tr. 341-342).   During the brief period that

---

[4]   The pubic symphysis is "the midline cartlilaginous joint uniting the superior rami of the
left and right public bones.   It is located anterior to the urinary bladder and superior to the
external genitalia...."   http://en.wikipedia.org/wiki/pubic_synphysis (last visited 2/20/2013).

[5]   Osteitis pubis is a noninfectious inflammation of the pubic synphysis that can cause
varying degrees of lower abdominal and pelvic pain.   The condition is "a well-known
complication of invasive procedures about the pelvis" and "may also occur as an inflammatory
process in athletes."   http://en.wikipedia.org/wiki/osteitis_pubis (last visited 2/20/2013).

14

Thomas did take treatment with Dr. Ali, he prescribed Ibuprofen, 800 mg., Tramedol, 100 mg., and Flexeril, 10 mg. for her pain complaints (Tr. 338-340).

Dr. Jeremy Scobbe, a gynecologist, examined Thomas on Nov. 25, 2008 (Tr. 346-349).  Thomas's primary complaint on that occasion was pain on the lower left side (Tr. 346).  Her current medications remained Tramadol, Flexeril and Ibuprofen.  Following examination, Dr. Scobbe concluded that Thomas's complaints of hip and back pain were not related to any gynecological concerns and were "more likely to be musculoskeletal in nature...." (Tr. 349).  Dr. Scobbe, however, did diagnose menometrorrhhagia[6] with severe dysmenorrhea[7] (Tr. 349).  Dr. Scobbe discussed endometrial ablation.[8]  Although Thomas indicated an interest in this outpatient procedure, she did not go through with the procedure according to her hearing testimony.

Ed Ross, Ph.D., prepared a psychiatric review technique for Thomas on behalf of the Commissioner on Jan. 6, 2009 (Tr. 351-362).  Dr. Ross found no severe mental impairments, only mild affective disorder (Tr. 351).  He similarly determined that Thomas had only mild functional limitations in her daily activities, social functioning and maintaining concentration, persistence or pace (Tr. 361).  He found no episodes of decompensation and no mental health

---

[6]  Menometrorrhhagia is prolonged or excessive uterine bleeding that may be caused by hormone imbalance, endometriosis, uterine fibroids or cancer.  "  http://en.wikipedia.org/wiki/menometrorrhhagia (last visited 2/20/2013).

[7]  Dysmenorrhea is a gynecological condition characterized by excessive pain during menstruation that interferes with daily activities.  http://en.wikipedia.org/wiki/period_cramps (last visited 2/20/2013).

[8]  Endometrial ablation is the removal or destruction of the endometrium (lining of the uterus) and is an alternative to a hysterectomy for women who experience uterine bleeding.  http://www.gynalternatives.com/ablation.htm (last visited Feb. 20, 2013).

treatment history or appreciable psychiatric care (Tr. 361-363).

On July 21, 2009, Thomas appeared at the University Women's Healthcare Clinic with multiple complaints of pain in her left leg, side and chest (Tr. 373).  She described the pain as burning or shooting (*Id*.).  A physical examination on that occasion revealed no sensory or motor deficits, a full range of motion and "no abnormalities on patient at all."  (Tr. 375).  Thomas  was referred to a neurologist for her "multiple vague pain complaints."  (Tr. 376).

Dr. Robert Zax and Nurse Practitioner, Health Mucci, of Dermatopathology Consultants examined Thomas from  June 30, 2009 (Tr. 379) through Sept. 8, 2009 (Tr. 377). Thomas on initial examination related a year-long history of progressive tender nodules in the left leg and abdomen, along with swelling (Tr. 379). A 5 mm. punch skin biopsy revealed no abnormalities other than small portions of superficial fat from the sample taken from Thomas's left flank (Tr. 379).  Thomas did present with apparent swelling in the left face and was tender to palpation on the left side (Tr. 378).  Dr. Zax's impression was possible panniculitis.[9]  When Thomas returned on July 10, 2009, for removal of her sutures from the skin biopsy, ARPN Mucci advised her that all of her lab blood work fell within normal range, and that her biopsy was most consistent with a lesion of urticaria or angioedema.[10]  (Tr. 378).

---

[9]  Panniculitis is a group of diseases characterized by inflammation of the subcutaneous adipose tissue (the fatty layer under the skin) with symptoms that include tender skin nodules. http://en.wikipedia.org/wiki/panniculitis (last visited 2/20/2013).

[10]  Urticaria, which is also known as "hives" is characterized by an outbreak of swollen, pale red bumps or patches on the skin that typically cause itching and may appear anywhere on the body.  Angiodema is a condition that is similar to hives, but the swelling occurs beneath the skin instead of on the surface and may appear around the eyes, lips, genitals, hands and feet. Either of these conditions may last for up to several days before resolving. http://www.webmd.com/allergies/guide/hives-urticaria-angioedema (last visited 2/20/2013).

Dr. Zax recommended treatment with Xyzal, 5 mg for urticaria (*Id*.).  When Thomas returned two weeks later on July 2, 2009, she reported no improvement as a result of her daily treatment with Xyzal.  ARNP Mucci advised her that "from a dermatologic standpoint there is no cause for the tenderness and edema...."  (*Id*.).  Thomas was to be referred to a rheumatologist, but the administrative record gives no indication that she was treated by one.  When Thomas returned on Sept. 8, 2009, she reported that the rheumatologist would not see her because rheumatologists do not perform biopsies (Tr. 377).  Thomas was advised that a deep tissue biopsy would be performed by another doctor, and that Dr. Zax would like a rheumatologist to evaluate her due to her "unilateral complaints of tenderness and edema...." (*Id*.).

Dr. Eric Davis examined Thomas on Sept. 29, 2009, based on Dr. Zax's request for a full thickness biopsy given her complaints of left flank chest wall and left-side abdominal pain (Tr. 380).  A biopsy of a subcutaneous nodule in the left chest wall was performed on Oct. 9, 2009 (Tr. 381-82).  The biopsy revealed only benign adipose tissue with no significant histopathological findings (Tr. 382).

Dr. Jules Barefoot performed a consultative physical examination of Thomas for the Commissioner on Nov. 9, 2009 (Tr. 383-388).  His physical examination revealed diffuse tenderness in the musculature of the left arm and leg with no evidence of muscle asymmetry or joint redness or warmth and no evidence of any focal motor or sensory deficits (Tr. 384).  Range of motion measurements confirmed full mobility in the cervical and lumbar spine, as well as the shoulders, elbows, wrists, hips, knees and ankles (Tr. 385).  Thomas revealed full flexion and grip strength in both hands and her lower and upper extremity motor strength was graded 5/5

17

throughout (Tr. 385).  Dr. Barefoot in his discussion indicated that no diagnosis had been

determined for Thomas's complaints of left-side pain.  Based solely on her subjective

complaints, he indicated that her ability to do "significant but strenuous work-related activity

does appear to be impaired...." a conclusion that ALJ Curlee rejected (*Id*.).  Otherwise, Dr.

Barefoot related no limitations based on his examination.

On Nov. 11, 2011, Amanda Lange, M.D., a non-examining consultant for the

Commissioner, offered her opinion that the impairments noted by Dr. Barefoot did not appear to

have any significant impact on Thomas's ability to perform work-related activities and were

considered by Dr. Lange to be non-severe (Tr. 389).

Dr. Rukmaiah Bhupalam of Bluegrass Neurology and Sleep Medicine examined

Thomas on Dec. 17, 2009 (Tr. 391).  He assessed fibromyalgia, thalmic pain syndrome,

neuralgia NOS and optic neuritis.  Dr. Bhupalam noted that an MRI of Thomas's brain was

normal and that he was "unable to explain her symptoms and come to an accurate diagnosis."

(Tr. 391).  Dr. Bhupalam concluded that Thomas would benefit by evaluation at the Cleveland

Clinic or the Vanderbilt University Medical Center (Tr. 390-391).  Thomas did not obtain further

evaluation at either institution.

Medical records supplied to ALJ Curlee immediately prior to the administrative

hearing held on June 14, 2011, revealed  the following significant facts. Diagnostic imaging of

Thomas's pelvis on June 9, 2010, confirmed the presence of a right ovarian simple cyst, but was

otherwise negative (Tr. 393).  A mammogram of the left breast revealed no evidence of

malignancy and no palpable abnormality (Tr. 394).  X-ray examination of the ribs performed at

Sts. Mary & Elizabeth Hospital on May 12, 2010, revealed no abnormality (Tr. 396).  Thomas

was treated briefly at the hospital emergency department on May 12, 2010 for complaints of left side and rib pain and was discharged on the same date with a prescription for Toradol (Tr. 397-400).  Physical examination of her chest and ribs on that date revealed no abnormalities or acute disease (Tr. 403).

Treatment records of the U of L Family Medicine Center from June 16, 2010, through Nov. 22, 2010, reflect complaints of lower left quadrant pain (Tr. 405).  On Oct. 18, 2010, Thomas was evaluated for physical therapy (Tr. 407-408).  Thomas apparently had earlier attempted physical therapy in August of 2009, but was discharged due to her failure to attend any physical therapy appointments other than her initial evaluation (Tr. 422).  Treatment notes at the Family Medicine Center dated July 14, 2010, reveal normal lab tests except for a high LDL reading.  Dr. Krigger suspected bipolar disorder with somatism (Tr. 410).  The doctor's assessment was Class 1 obesity with fibromyalgia to be treated with Savella, 12.5 mg. in increasing dosages (Tr. 410).  Dr. Krigger also made a referral to a psychologist (Tr. 410, 412).  The administrative record contains no indication that Thomas obtained psychological treatment.

Review of the medical records, as discussed above, reveals that no treating physician was able to obtain a clear diagnosis to explain Thomas's pain-related complaints.  No physician imposed any limitations on her as a result of her subjective complaints.  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 596 (6th Cir. 2005).  Several of her treating physicians, and other healthcare professionals, discharged Thomas from treatment due to her noncompliance.  Repeated diagnostic imaging of her spine, pelvis, brain, ribs and abdomen all proved to be within normal limits, except for some arthritis-related degenerative changes in the pubis synphysis.  Physical examination on various occasions, as noted, reveal essentially a full range of motion,

along with normal strength throughout the extremities.  In short, there is nothing in the record that would establish Thomas's impairments to be severe, so as to significantly impact her ability to perform basic, work-related activities as defined by 20 C.F.R. 416.921, *et seq.*  ALJ Curlee likewise properly rejected Thomas's complaints of disabling pain given her voluntary cessation of pain medication for extended periods, her noncompliance with treating physicians, her lack of exertional limitations, and her activities of daily living which included being the sole care provider for four school-age children.

As for Thomas's claim that ALJ Curlee slept through a portion of the hearing, nothing in the hearing transcript confirms this accusation.  To the contrary ALJ Curlee questioned Thomas repeatedly at various points in the proceedings.  Also, Thomas was represented by counsel throughout the hearing. Presumably counsel would have made note if there were any such gross irregularities. More importantly, Thomas does not indicate what portion of the hearing ALJ Curlee supposedly missed, if he did miss any, or how his alleged inattentiveness affected the outcome of the proceedings. In short nothing in the record supports this particular claim.

The thermographic examination evidence recently supplied by Thomas may not be considered as it is not new and material evidence. *See Cotton v. Sullivan,* 2 F.3d 692, 695 (6th Cir. 1993); *Sizemore v. Sec. of HHS,* 865 F.2d 709, 711 (6th Cir. 1988).  Thomas did not receive a thermographic examination until January 9, 2013 more than one year after the hearing before ALJ Curlee.  The examination report was not offered as part of the administrative record prior to the filing of the present suit.  Further, Thomas does not explain how the report creates a reasonable probability that the Commissioner would have reached a different result on her

20

disability claim if she presented this new evidence on remand pursuant to sentence 6 of 42 U.S.C. § 405(g).  *Oliver, Sec. Of HHS,* 804 F.2d 964, 966 (6th Cir. 1986).  The report itself ultimately concludes only that "[t]here is no thermal correlate to the reported pain and numbness on the left side of the body." (DN 16, exh. p. 2).  In other words, the examination findings of Dr. Thomas Hudson, like those of every other treating or examining physician, can identify no medical explanation for Thomas's complains of persistent left-side pain.

   For all of the above reasons, the Magistrate Judge shall enter a separate order that dismisses the complaint of the Plaintiff with prejudice.

cc: Plaintiff *pro se*
   Counsel of Record